**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **GERMAN QUILES** | : | **07-391-01** |
| **MARIA QUILES** | : | **-02** |
| **GLORIA QUILES** | : | **-03** |

<u>**DuBOIS, J.**</u>                                                                        **AUGUST 13, 2008**

<u>**MEMORANDUM**</u>

An Indictment filed on July 12, 2007 charged defendants German, Maria, and Gloria

Quiles with one count of conspiracy to commit money laundering in violation of 18 U.S.C.

§ 1956(h) (Count 1) and sixteen counts of money laundering and aiding and abetting in violation

of 18 U.S.C. §§ 1956(a)(3)(B) and 2 (Counts 2 through 17).  On January 17, 2008, a jury

convicted defendants German and Maria Quiles on all counts.  The jury acquitted defendant

Gloria Quiles of conspiracy to commit money laundering (Count 1) and ten counts of money

laundering and aiding and abetting (Counts 2 through 11), and convicted her on the remaining six

counts of money laundering and aiding and abetting (Counts 12 through 17).

Presently before the Court are defendants' motions for judgment of acquittal and new trial

pursuant to Federal Rules of Civil Procedure 29 and 33.  For the reasons stated below,

defendants' motions for judgment of acquittal and new trial are denied.

**I.  BACKGROUND**

Defendants German and Maria Quiles are husband and wife and proprietors of Aruba

Incorporated ("Aruba"), a money service business ("MSB") located in North Philadelphia.

Aruba, which did business as Aruba Auto Tag Service and Aruba Check Cashing, was an agent

of Moneygram Corporation and Ameracash Solutions, and offered money orders, money

transfers, check cashing, bill paying, and other services to the public.  (See Jan. 7, 2008 Trial Tr.

67, 128-131, 144.)   German Quiles was president of Aruba and served as its compliance officer.[1]

(Jan. 7, 2008 Trial Tr. 137; Jan. 8, 2008 Trial Tr. 77; Gov't Exs. 50B-50D.)  Maria Quiles was

Aruba's co-president and 100% owner of the business.  (Jan. 14, 2008 Trial Tr. 117-18, 120;

Gov't Ex. 78.)  The Quiles's daughter, Gloria, served as secretary of Aruba and co-owned the

business property with her father.  (Jan. 8, 2008 Trial Tr. 95-96; Jan. 14, 2008 Trial Tr. 132-33;

Gov't Ex. 80.)

In July, 2006, at the direction of Immigration and Customs Enforcement ("ICE") Special

Agent Steven Galambos, a confidential source, Hector Ayala ("Ayala"), initiated contact with

German Quiles at Aruba.  Ayala told German Quiles that he – Ayala – worked for a Colombian

drug dealer and needed to launder drug money. (Jan. 9, 2008 Trial Tr. 211.)  He also advised

German Quiles of the ways in which he wanted the money laundered.  (Jan. 9, 2008 Trial Tr.

212.)  In response, German Quiles stated to Ayala, "You want money laundry, money."  (Gov't

Ex. 1A; Jan. 9, 2008 Trial Tr. 216-18.)  Based on that meeting between Ayala and German

Quiles, Special Agent Galambos determined that further investigation of Aruba was warranted.

(Jan. 7, 2008 Trial Tr. 159.)

Beginning in September, 2006, Ayala, under the supervision of Special Agent Galambos,

conducted over 30 transactions at Aruba as part of an undercover investigation.  (Jan. 8, 2008

Trial Tr. 53.)  The transactions took place over sixteen days and spanned a period of five months.

In that time, Ayala laundered approximately $175,900 with funds he represented to be proceeds

---

[1]  As a money service business, Aruba was required to comply with the federal Bank
Secrecy Act and other rules and regulations as established by the federal government.  (See Jan.
7, 2008 Trial Tr. 55-57, 68-69.)

2

from drug distribution.  (Jan. 7, 2008 Trial Tr. 160.)  Typically, Ayala arrived at Aruba carrying

thousands of dollars in small bills in a Dunkin' Donuts bag.  (Jan. 11, 2008 Trial Tr. 9.)  Ayala

would meet one or more of the defendants at a side door away from Aruba's other customers and

discuss with defendants how to launder the funds.[2]  (Jan. 11, 2008 Trial Tr. 11-12.) That door

lead from Aruba's customer service area to an "Employees Only" area. (See Gov't Ex. 74L; Jan.

9, 2008 Trial Tr. 210-11.)

     The funds were laundered by defendants in three ways: first, by wire transferring $6,000

to the Dominican Republic; second, by issuing approximately 84 money orders totaling $36,000;

and, third, by exchanging small denominations of U.S. currency (e.g. $10 and $20 bills) for $100

bills totaling $133,900.  (Gov't Ex. 82.)  For their services, defendants were paid $9,800.  (Jan. 7,

2008 Trial Tr. 157, 161.)  These fees were paid to defendants in addition to the money that was

laundered.  (Jan. 7, 2008 Trial Tr. 161.)

     During every encounter with the defendants, Ayala wore a body recording device.  (Jan.

9, 2008 Trial Tr. 208-09; Jan. 8, 2008 Trial Tr. 53.)  The purpose of equipping Ayala with the

device was to gather further evidence that defendants were knowingly violating anti-money

laundering laws ("AML").  At trial, the government introduced recordings of some of these

encounters.  In six of these recordings, Ayala can be heard telling German or Gloria Quiles that

his money is "drug money."  (See Gov't Exs. 3A, 6A, 18A, 24A, 27A, 28A.)  Special Agent

Galambos testified that he instructed Ayala to "represent the ICE funds as drug money to the

Quiles['s]" and to "direct his comments toward them, at them – when he had the opportune time

. . . and [to] try to seek [defendants'] understanding that they were advised, that they understood

---

   [2]  Ayala testified that, during the course of the investigation, he spoke to each of the
defendants at the side door.  (Jan. 11, 2008 Trial Tr. 11-12.)

that he had drug money." (Jan. 7, 2008 Trial Tr. 168.) In two of the tapes, German Quiles

acknowledges that what Ayala was seeking was to launder "drug money." (Gov't Exs. 1A, 3A.)

In another tape, Gloria Quiles is told by Ayala that his money is drug money. To that statement,

Gloria Quiles smiled and responded, "Really?" (Jan. 11, 2008 Trial Tr. 45; Gov't Ex. 27A.)

The government concluded its undercover investigation of Aruba in January, 2007. On

July 12, 2007, defendants were indicted for money laundering, aiding and abetting money

laundering, and conspiracy to commit money laundering. A 10-day trial took place in January,

2008. On January 17, 2008, defendants were convicted. Defendants now seek a judgment of

acquittal or new trial.

## II. STANDARD OF REVIEW

### A. Motion for Judgment of Acquittal

A motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal

Procedure may only be granted where the evidence is insufficient to sustain the conviction.[3]

United States v. Gonzales, 918 F.2d 1129, 1132 (3d Cir. 1990). The court must determine

whether the government has adduced "substantial evidence to support the jury's guilty verdict."

United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1988).

In ruling on such a motion, a court may not weigh the evidence, nor may it make

credibility determinations which are within the domain of the jury. Rather, the court must

consider the evidence in the light most favorable to the government, draw all reasonable

inferences in favor of the government, and "presume that the jury has properly carried out its

---

[3] Federal Rule of Criminal Procedure 29(a) provides, in pertinent part: "The court on
motion of a defendant or of its own motion shall order the entry of judgment of acquittal . . . if
the evidence is insufficient to sustain a conviction of such offense or offenses."

function of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." United States v. Wasserson, 418 F.3d 225, 237 (3d Cir. 2005). Viewing the evidence in its entirety, the verdict must be upheld unless "no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).

## B. Motion for a New Trial

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court may grant a defendant's motion for a new trial if required in the interest of justice.[4] "Whether to grant a Rule 33 motion lies within the district court's sound discretion." United States v. Polidoro, 1998 WL 634921, at *4 (E.D. Pa. Sept. 16, 1998) (citing United States v. Mastro, 570 F. Supp. 1388, 1390 (E.D. Pa. 1983)). In exercising its discretion, the court may grant a motion for a new trial on one of two grounds. First, the court may grant the motion "if, after weighing the evidence, it determines that there has been a miscarriage of justice." United States v. Terlingo, 2001 WL 474407, *1 (E.D. Pa. April 30, 2001). Second, the court "must grant a new trial if trial error had a substantial influence on the verdict." Id. at 1184; see also Gov't of the Virgin Islands v. Bedford, 671 F.2d 758, 762 (3d Cir. 1982) ("The reviewing court must decide whether the error itself had substantial influence on the minds of the jury." (brackets and quotation omitted)).

"Motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." Gov't of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir.1987) (citations omitted).

---

[4] Federal Rule of Criminal Procedure 33(a) provides, in pertinent part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment."

## III.  DISCUSSION

### A.  Legal Standard

#### i.  Money Laundering, 18 U.S.C. § 1956(a)(3)(B)

To obtain a conviction for money laundering under § 1956(a)(3)(B), the government must prove the following elements beyond a reasonable doubt: (1) defendants conducted or attempted to conduct a financial transaction which affected interstate or foreign commerce; (2) defendants conducted or attempted to conduct such a transaction with property represented to be proceeds of a specified unlawful activity (in this case, drug proceeds); (3) defendants knew the transaction involved property represented to be the proceeds of such unlawful activity; and (4) defendants conducted or attempted to conduct the financial transaction with the intent to conceal or disguise the nature, location, source, ownership or control of proceeds represented to be from unlawful drug distribution.  See United States v. Fuller, 974 F.2d 1474, 1478 (5th Cir. 1992).

#### ii.  Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h)

To prove conspiracy to commit money laundering, the government must establish that: (1) the conspiracy, agreement, or understanding to commit money laundering was formed, reached, or entered into by two or more persons; (2) at some time during the existence or life of the conspiracy, agreement, or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement; and (3) at some time during the existence or life of the conspiracy, agreement, or understanding, the defendant knew the purpose of the agreement, and then deliberately joined the conspiracy, agreement or understanding.  See United States v. Conley, 37 F.3d 970, 976-77 (3d Cir. 1994).

### iii.  Aiding and Abetting, 18 U.S.C. § 2

The essential elements of aiding and abetting money laundering are: (1) that the crime of money laundering was committed; (2) defendants knew that money laundering was being committed or were going to be committed; (3) defendants did some act for the purpose of aiding, assisting, facilitating and encouraging the money laundering and acted with the intent of causing that crime to be committed; and (4) defendants' acts did, in some way, aid, assist, facilitate and encourage money laundering.  See United States v. Dixon, 658 F.2d 181, 189 n. 17 (3d Cir. 1981).

## B.  Defendants' Motions for Judgment of Acquittal or New Trial

### i.  German Quiles's Motion For Judgment of Acquittal/Motion for a New Trial (Document No. 109)

German Quiles seeks a judgment of acquittal or new trial on the grounds that the government "did not present evidence beyond a reasonable doubt" that he laundered money and that there was a conspiracy to launder money (Def. German Quiles Mot. ¶2); that he attempted to conduct a financial transaction which affected interstate or foreign commerce (Def. German Quiles Mot. ¶3); or that he conducted or attempted to conduct a financial transaction with property represented to be proceeds of drug distribution. (Def. German Quiles Mot. ¶ 4.)

### ii.  Maria Quiles's Motion for Judgment of Aquittal [sic] and New Trial (Document No. 124)[5]

Maria Quiles argues that she is entitled to a judgment of acquittal or new trial "because

---

[5]  Maria Quiles filed a Motion for Judgment of Aquittal [sic] and New Trial and Leave to Supplement on January 24, 2008.  The Court granted leave to supplement by Order dated January 25, 2008.  On April 29, 2008, Maria Quiles filed the instant Motion for Judgment of Aquittal [sic] and New Trial, which covered the arguments made in the first motion.  For that reason, the Court addresses only the second motion in this Memorandum.

the jury's verdict is against the weight of the evidence." (Def. Maria Quiles Mot. ¶ 4.)  With respect to her convictions for money laundering, 18 U.S.C. §1956(a)(3)(B), she argues that the government failed to establish that she had knowledge that the transactions at issue involved proceeds represented to be from drug distribution or that she "deliberately avoided learning where the proceeds came from." (Def. Maria Quiles Br. 10, 11.)  Regarding the conspiracy count, she argues that "there is simply no evidence that [she] had knowledge of a conspiracy to launder proceeds of drug distribution."  (Def. Maria Quiles Br. 12.)

In support of her arguments, Maria Quiles asserts that the record reflects that she had no direct conversations with Ayala.  (Def. Maria Quiles Br. 8-9, 10.)  She further asserts that the evidence establishes that she was not present for the initial meeting between Ayala and German Quiles.  (Def. Maria Quiles Br. 7-8.)  Finally, she argues that the circumstances surrounding Ayala's transactions at Aruba would not necessarily have made her aware that Ayala "was a drug dealer or engaged in the specific unlawful activity of drug dealing."  (Def. Maria Quiles Br. 10.)

### iii.  Gloria Quiles's Motion for Judgment of Acquittal (Document No. 120) and Motion for New Trial in the Interest of Justice (Document No. 121)

Gloria Quiles seeks a judgment of acquittal on the ground that the evidence at trial was insufficient to support her conviction for six counts of money laundering and aiding and abetting. The thrust of her argument is that the government failed to prove that she "personally committed the[] offenses or . . . aided or abetted in their commission."  (Def. Gloria Quiles Mot. for Judgment of Acquittal ¶ 3.)  She asserts that Hector Ayala's testimony was "strange" and "non-specific" and that there is no "specific evidence from Ayala regarding which Aruba employee did what on each particular date."  (Def. Gloria Quiles Mot. for Judgment of Acquittal ¶ 3©.)  Finally, with respect to the government's recordings, Gloria Quiles argues that the "tapes

disclose[] no illegal acts" on her part.  (Def. Gloria Quiles Br. in Supp. of Mot. for Judgment of

Acquittal 5.)

In her separate Motion for New Trial in the Interest of Justice, Gloria Quiles argues that

she is entitled to a new trial because the government, through use of a recording, "attributed

another person's conduct to [her]."  (Def. Gloria Quiles Mot. for New Trial ¶ 7.)

To convict Gloria Quiles, the government relied, in part, on an audio recording from

January 11, 2007, in which a woman tells Ayala that he would have to return to Aruba at a later

time because "the lady" was not there.[6]  At trial, the government asserted that the woman who

spoke to Ayala was Gloria Quiles.  (Gov't Ex. 30A.)  In her motion for new trial, Gloria Quiles

asserts that the woman's voice on the audiotape was not hers.  She notes that another female

employee named Jessica was present at Aruba at the time the audio recording was made and that

in other instances, she, Gloria, referred to "the absent owner as 'my mother,' rather than 'the

lady.'"  (Def. Gloria Quiles' Mot. New Trial ¶ 4.)  In short, Gloria Quiles asserts that she has been

"misidentified" as "the voice on the January 11 tape."  (Def. Gloria Quiles Br. in Supp. of Mot.

New Trial 2.)

Although the audio recording in question covers only one conversation on January 11,

2007, Gloria Quiles argues that she should be granted a new trial on all counts on which she was

convicted because the recording from that date "constituted a key piece of evidence" in the case

against her.  (Def. Gloria Quiles Br. in Supp. of Mot. New Trial 2.)  She states: "[t]he

government used the tape to establish that Gloria was part of an ongoing scheme designed to

---

[6]  Nearly every conversation between Ayala and defendants was in Spanish.  Thus, the woman on the recording, whom the government identifies as Gloria Quiles, does not actually say "the lady," but rather "la señora."  (See Gov't Ex. 30A.)

launder money.  So employed, each individual audiotape necessarily had a cumulative effect upon the jury, suggesting guilt with respect to all of the other transactions."  (Def. Gloria Quiles Br. in Supp. of Mot. New Trial 2.)

"[A]t a minimum," Gloria Quiles argues that she should be granted "a new trial with respect to Count 16 of the Indictment" because the tape was "the sole evidence that she personally engaged in a transaction on [January 11, 2007]."  (Gloria Quiles Br. in Supp. of Mot. New Trial 1-2.)

## C.  Government's Response to Defendants' Motions for Judgment of Acquittal and New Trial

The government asserts that defendants' motions for judgment of acquittal and new trial must be denied because their convictions are supported by "overwhelming evidence."  (Gov't's Resp. 2.)  In particular, the government argues, *inter alia*, that the evidence at trial established (1) that defendants were trained by the Internal Revenue Service ("IRS"), Ameracash, and Moneygram to detect and report suspicious activity; (2) that structuring transactions to avoid reporting requirements violated anti-money laundering laws; (3) that defendants knew or believed that Ayala's funds were proceeds from illegal drug distribution; (4) that defendants structured Ayala's transactions to avoid reporting requirements and to "conceal that they were doing business with Ayala"; (5) that the fees defendants received from Ayala were extraordinary; (6) that the volume of business Ayala conducted at Aruba was extraordinary; (7) that the manner in which the transactions were conducted was evidence of illegal activity; and (8) that the recordings constituted "direct evidence" of defendants' knowledge that Ayala's funds were "represented drug proceeds."  (Gov't Resp. 8.)

**D. Analysis**

As stated above, German and Maria Quiles were convicted of one count of conspiracy to commit money laundering (Count 1) and sixteen counts of money laundering and aiding and abetting (Counts 2 through 17). Each of the sixteen counts of money laundering and aiding and abetting corresponded to the different days on which Ayala conducted transactions at Aruba. Those dates and corresponding counts are:

| | |
|---|---|
| September 20, 2006 | Count 2 |
| September 21, 2006 | Count 3 |
| September 22, 2006 | Count 4 |
| September 25, 2006 | Count 5 |
| October 2, 2006 | Count 6 |
| October 3, 2006 | Count 7 |
| October 19, 2006 | Count 8 |
| October 20, 2006 | Count 9 |
| November 2, 2006 | Count 10 |
| November 3, 2006 | Count 11 |
| December 6, 2006 | Count 12 |
| December 7, 2006 | Count 13 |
| December 8, 2006 | Count 14 |
| January 10, 2007 | Count 15 |
| January 11, 2007 | Count 16 |
| January 12, 2007 | Count 17 |

Gloria Quiles was acquitted of the conspiracy charge (Count 1) and ten counts of money laundering (Counts 2 through 11). She was found guilty of six counts of money laundering and aiding and abetting (Counts 12 through 17). Those six counts corresponded to the following dates: December 6, 7, and 8, 2006, and January 10, 11, and 12, 2007.

Having reviewed the evidence in its entirety in the light most favorable to the government, the Court concludes that the evidence presented at trial provided a sufficient basis for a reasonable juror to conclude that each of the defendants was guilty beyond a reasonable doubt of the crimes for which they were convicted. Coleman, 811 F.3d at 807. Therefore, a judgment of acquittal is not warranted.

11

### i.  Government's Evidence

#### (a)  Evidence that defendants conducted or attempted to conduct financial transactions that affected interstate or foreign commerce

The government's evidence establishes that on each of the sixteen days charged in the indictment, defendants German and Maria Quiles conducted or attempted to conduct financial transactions for Ayala that affected interstate or foreign commerce.[7]  Those transactions included money orders, wire transfers, and cash exchanges.  At a minimum, the transactions totaled $3,000 on one day.  (Jan. 8, 2008 Trial Tr. 50; Gov't Ex. 82.)  On seven different days, the transactions totaled over $10,000, with one day's transactions totaling as much as $22,000.  (Jan. 7, 2008 Trial Tr. 194-200; Jan. 8, 2008 Trial Tr. 38-53; Gov't Ex. 82.)

Hector Ayala and Special Agent Galambos both provided extensive testimony regarding Ayala's various transactions.  During his testimony, Special Agent Galambos covered each of the sixteen days, explaining how much money Ayala possessed upon entering Aruba on each day and the nature of his transactions at Aruba on each day.  (Jan. 7, 2008 Trial Tr. 185-200; Jan. 8, 2008 Trial Tr. 38-53.)  His testimony reflects that on each of the dates charged, defendants conducted one or more financial transactions for Ayala.  The government also presented audio recordings for fifteen of the sixteen days in which Ayala transacted business at Aruba.  In each of those recordings, either German or Maria Quiles, or both, can be heard conducting or attempting to conduct financial transactions for Ayala.

---

[7]  The parties stipulated that Aruba was a financial institution whose business affected interstate and foreign commerce.  (Jan. 8, 2008 Trial Tr. 97-98; Gov't Ex. 72.)  Moreover, the money orders issued by Aruba were Moneygram International money orders and a Moneygram representative testified at trial that Moneygram's business affected interstate or foreign commerce.  (Jan. 14, 2008 Trial Tr. 145.)

Other evidence supports the conclusion that German and Maria Quiles conducted or attempted to conduct financial transactions for Ayala on all sixteen dates charged.  At trial, Ayala testified that during the course of the investigation Maria Quiles was in charge of the money orders and decided the amount of the money orders.  (Jan. 11, 2008 Trial Tr. 16; Jan. 14, 2008 Trial Tr. 104.)  Ayala received money orders on fifteen of the sixteen days charged in the Indictment.[8]  He also testified that German Quiles decided the amount in large bills he would receive.  (Jan. 14, 2008 Trial Tr. 104.)  Ayala exchanged small bills for large bills on every day charged in the Indictment.  On the basis of this evidence, a reasonable juror could conclude that defendants German and Maria Quiles conducted or attempted to conduct financial transactions for Ayala as charged.

Similarly, a reasonable juror could accept the government's evidence as sufficient to establish that Gloria Quiles conducted or attempted to conduct financial transactions for Ayala on the six different days for which she was convicted.  Gloria Quiles can be heard on audio recordings for December 6, 7, and 8, 2006, and January 11 and 12, 2007.[9]  In each of those tapes, Gloria Quiles discusses with Ayala the issuance of money orders or other financial transactions. In some recordings, Ayala tells Gloria Quiles his funds are "drug money."  Further, Ayala's testimony supports the conclusion that Gloria Quiles conducted or attempted to conduct financial

---

[8]  The only day on which Ayala did not receive money orders is November 3, 2006.  On that day, he exchanged $12,000 in small bills for large bills.  (Jan. 8, 2008 Trial Tr. 45.)

[9]  Gloria Quiles maintains that, contrary to the government's assertion, a woman's voice on the January 11, 2007 is not her voice.  As evidence, she points to the fact that the woman refers to Maria Quiles as "the lady" and not "my mother."  This argument is rejected.  Ayala testified that the woman is, in fact, Gloria Quiles.  Further, the fact that the woman refers to Maria Quiles as "the lady" does not establish that the woman is anyone other than Gloria Quiles.

transactions for him on those dates.  (Jan. 11, 2008 Trial Tr. 36-58.)  As for Gloria Quiles's

conviction for money laundering on January 10, 2007, Gloria Quiles's car was observed by

Special Agent Galambos at Aruba on that day, as it was on all days corresponding to the counts

for which she was convicted.  (See Gov't Ex. 82.)

> **(b) Evidence that the transactions were conducted with property represented
> to be drug proceeds**

The evidence establishes that Ayala repeatedly represented the funds in question as

proceeds of unlawful drug distribution.  On September 20, 2006, Ayala stated to German Quiles:

"Yeah, yeah, but as this is drug money . . . I don't want trouble for you either, because I've never

been in that kind of trouble, you know."  (Gov't Ex. 3A.)  On September 21, 2006, Ayala stated

to German Quiles: "Uh . . . that's why (UI) because this is drug money."[10]  (Gov't Ex. 6A.)  On

October 19, 2006, Ayala stated to Gloria Quiles: "No, no, it's alright, OK, it's alright, OK.  It's

just that it's drug money."  (Gov't Ex. 19A.)  On December 6, 2006, Ayala stated to Gloria

Quiles: "And if you have anything large, you can exchange it for hundreds . . . It's so that I don't

take the money . . . Because as it is drug money, I don't want no problems."  (Gov't Ex. 24A.)

On December 7, 2006, Ayala stated to Gloria Quiles: "OK.  I'll be back tomorrow.  Because this

is drug money."  (Gov't Ex. 27A.) He also stated to Gloria Quiles on December 7, 2006: "I

wanted to ask you another quick question.  You can (UI) here also, right?  Because they're (UI)

from drugs."  (Gov't Ex. 27A.)  To this statement, Gloria Quiles responded, "Really?"  (Gov't

Ex. 27A.)  On December 8, 2006, Ayala stated to German Quiles: "Alright, yeah, because as it's

money from, from, drug money . . . ."  (Gov't Ex. 28A.)

---

[10] "(UI)" stands for unintelliglbe.

### (c)  Evidence that defendants believed that Ayala's funds were drug money

The government introduced direct and circumstantial evidence relating to defendants' knowledge or belief that Ayala's funds were proceeds from unlawful drug distribution.  The government's direct evidence consisted of the audio recordings cited above, as well as extensive testimony from Special Agent Galambos and Hector Ayala.  Ayala testified that when he told German Quiles on September 20, 2006, that "this is drug money," German Quiles "made a signal with his hands, and that to me I understand as do not worry."  (Jan. 11, 2008 Trial Tr. 15.)  The recording from September 20, 2006, discloses that German Quiles did indeed understand Ayala's objective, as he raises the issue of the "United States Department regulation, . . . Laundry Money" to Ayala.  (Jan. 11, 2008 Trial Tr. 13; Gov't Ex. 3A.)

Ayala further testified that when he told German Quiles on September 21, 2006, that his money was drug money, German Quiles responded "all right."[11]  Ayala stated that he understood that to mean that German Quiles "knew what I was doing."  (Jan. 11, 2008 Trial Tr. 19; Gov't Ex. 6A.)

With respect to Gloria Quiles, Ayala testified that when he told her on October 19, 2006 that "this is drug money," Gloria's "expression was fine, because she always gave me a smile, so I always felt that it was all right."  (Jan. 11, 2008 Trial Tr. 33.)  Similarly, when he told her on December 6, 2006, that "it is drug money," Gloria "gave [Ayala] a smile."  (Jan. 11, 2008 Trial Tr. 40.)  Finally, on December 7, 2007, upon hearing from Ayala that he possessed drug money, Gloria Quiles smiled and responded, "Really?" (Jan. 11, 2008 Trial Tr. 45.)

---

[11]  This is an English translation of what German Quiles actually stated, which was "ta bien."  (Gov't Ex. 6A.)

15

Maria Quiles correctly states that there are no recordings in which Ayala can be heard informing her, personally, that his money is drug money.  However, there is evidence in the record from which it can be inferred that Maria Quiles was aware of that fact.  First, Ayala testified that Maria Quiles was present at Aruba during the initial meeting between him and German Quiles on July 18, 2006, during which Ayala informed German Quiles that he worked for a Colombian drug dealer and wished to launder drug money.  (Jan. 9, 2008 Trial Tr. 213.) Ayala testified that Maria Quiles was in close proximity – within arm's reach – of German Quiles during that meeting.  (Jan. 9, 2008 Trial Tr. 214, 218.)  Second, Ayala testified that Maria Quiles was in the employee work area at Aruba on September 20, 2006, when he and German Quiles discussed money laundering in detail.  (Jan. 11, 2008 Trial Tr. 15-16.)

There is other circumstantial evidence going to each of the defendants' knowledge or belief that Ayala's funds were proceeds of unlawful drug distribution.  Among this evidence is the testimony of Special Agent Galambos and Hector Ayala that every time Ayala conducted a transaction at Aruba, he brought thousands of dollars into the store in a Dunkin' Donuts bag. (Jan. 11, 2008 Trial Tr. 9.)  Ayala testified that, during the course of the investigation, he handed a Dunkin' Donuts bag to each of the defendants.  (Jan. 11, 2008 Trial Tr. 9.)

Further, Ayala testified that during his visits to Aruba defendants treated him differently from other customers. (Jan. 11, 2008 Trial Tr. 11.)  He stated that he did not have to wait in line like Aruba's other customers and that he did not transact business at the customer windows; rather, he went "straight to the door." (Jan. 11, 2008 Trial Tr. 11.)  Ayala testified that he spoke to each of the defendants at the side door leading to the employee work area. (Jan. 11, 2008 Trial Tr. 12.)

16

Next, there is the volume of business Ayala conducted at Aruba during the course of the investigation and the amount in fees he paid to the defendants.  A reasonable juror could conclude that the defendants were aware that Ayala's funds were proceeds of drug distribution based on the evidence that Ayala transacted over $175,000 in business at Aruba in a relatively short period of time.  Aruba was located in a low-income, high crime neighborhood and Ayala was not known to defendants prior to the start of the investigation.  (Jan. 7, 2008 Trial Tr. 75-76; Jan 9, 2008 Trial Tr. 207, 214; Jan. 11, 2008 Trial Tr. 60.)  On some days, Ayala transacted over $10,000 in business at Aruba.  Moreover, Ayala was paying defendants extraordinary fees.  A typical customer at Aruba paid no more than $.99 per money order, (Jan. 14, 2008 Trial Tr. 122), but Ayala was paying hundreds of dollars for the same service.  (Gov't Ex. 82.)  From these facts, a reasonable juror could infer that defendants were aware that Ayala's funds were the proceeds of unlawful drug distribution.

Finally, and perhaps most significantly, there is evidence that defendants structured Ayala's transactions to avoid reporting requirements.  As a money service business, Aruba was required to file a currency transaction report ("CTR") when transactions by a single individual in one day aggregated to $10,000 or more.  (Gov't Ex. 45.)  Similarly, Aruba was required to file a suspicious activity report ("SAR") when "suspicious transactions" by an individual totaled $2,000 or more on any given business day.  (Gov't Ex. 45.)  Further, federal law requires that MSBs report sales of money orders totaling $3,000 or more to one person in one day.  (Jan. 7, 2008 Trial Tr. 59.)  Finally, as an MSB, Aruba was required to keep records of currency exchanges of more than $1,000.  (Jan. 7, 2008 Trial Tr. 60.)  With respect to Ayala, defendants failed to comply with  these requirements, although they were aware of their duty to comply.

(Jan. 9, 2008 Trial Tr. 27-28, 41; Jan. 7, 2008 Trial Tr. 60-62, 130, 115-17; Jan. 14, 2008 Trial

Tr. 120, 125, 132.)  In fact, the evidence at trial gives rise to an inference that defendants

deliberately structured Ayala's transactions to avoid some of these reporting requirements.  (Jan.

14, 2008 Trial Tr. 166-67.)

        The trial evidence discloses that, over the course of the investigation, defendants provided

Ayala with 84 money orders totaling $36,000.  (Gov't Ex. 82.)  None of those money orders

exceeded $500 and frequently the money orders were non-sequential.[12]  (Gov't Ex. 82.)  On

multiple occasions, Ayala was advised that he would be given some money orders at the time of

his initial visit and the remaining money orders at a later time within the same day or the next

day.  (Jan. 11, 2008 Trial Tr. 15.)  Ayala testified that he understood the purpose of splitting up

the transactions to be for defendants' "protection."[13]  (Jan. 11, 2008 Trial Tr. 15.)  When asked

what defendant Maria Quiles was protecting against, Ayala stated: "As the money I'm leaving

them is drug money, she couldn't do it all together at the same moment."  (Jan. 11, 2008 Trial Tr.

24.25.)  In addition to this evidence, the government elicited testimony from a Moneygram

representative concerning "structuring."  The Moneygram representative testified that, under

certain circumstances, splitting transactions into smaller amounts and issuing non-sequential

money orders was tantamount to "structuring," in violation of federal law.  (Jan. 14, 2008 Trial

_____

        [12]  In other words, although Ayala would be given several money orders at one time, the
reference numbers on those money orders were not in sequence.  For example, on the afternoon
of September 20, 2006, during his third visit to Aruba on that day, Ayala was given four money
orders.  Those money orders ended in -77, -80, -93, and -97.  (Jan. 14, 2008 Trial Tr. 166-168.)

        [13]  Ayala testified:  "I understand that coming back in one hour, he's going to do it little-
by-little, and when he does it little-by-little, he's protecting himself, and he's protecting me."
(Jan. 11, 2008 Trial Tr. 15.)

Tr. 167.)  All of this evidence gives rise to an inference that defendants knew or believed that Ayala's funds were proceeds from unlawful drug distribution.

### (d)  Evidence that defendants conducted transactions with intent to conceal or disguise the nature, location, source, ownership or control of proceeds represented to be from unlawful drug distribution

The government' s evidence regarding defendants' structuring of Ayala's transactions and failure to track and report those transactions also demonstrates that defendants sought to conceal or disguise the nature, location, source, ownership or control of proceeds represented to be from unlawful drug distribution.  Each of the defendants was aware of the reporting and recording requirements set by the federal government and by Moneygram and Ameracash. (Jan. 9, 2008 Trial Tr. 27-28, 41; Jan. 7, 2008 Trial Tr. 60-62, 130, 115-17; Jan. 14, 2008 Trial Tr. 120, 125, 132.)  Yet, none of the defendants filed CTRs or SARs.  In fact, the evidence suggests that defendants structured Ayala's transactions to avoid detection.

### ii.  Judgment of Acquittal Not Warranted

Viewing the government's evidence in its entirety, and in the light most favorable to the government, the Court concludes that a reasonable juror, having properly carried out her function of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences, could conclude that all defendants were guilty of money laundering beyond a reasonable doubt. Similarly, based on the government's evidence, the Court concludes that a reasonable juror could conclude that all defendants were guilty beyond a reasonable doubt of aiding and abetting money laundering.

As to German and Maria Quiles's conviction for conspiracy to commit money laundering, the Court concludes that there was sufficient evidence from which a reasonable juror could conclude that German and Maria Quiles were guilty of that crime beyond a reasonable doubt.

The law of conspiracy does not require that the government prove that defendants entered into a formal agreement or expressed their criminal goal in words or writing.  What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.  There is extensive evidence, including all of the evidence discussed above, that German and Maria Quiles had an agreement or mutual understanding to cooperate with each other to engage in money laundering and wilfully participated in that agreement.  Further, the government's evidence establishes that German and Maria Quiles knowingly performed overt acts in furtherance of their agreement.  Accordingly, the Court denies all defendants' motions for judgment of acquittal.

### iii.  New Trial Not Warranted

Both German and Maria Quiles move for a new trial on the ground that the evidence does not support their convictions.  The Court denies German and Maria Quiles's Motions for New Trial for the reasons provided above.  Gloria Quiles raises a different argument in her Motion for New Trial and for that reason the Court addresses her motion separately.

As noted above, Gloria Quiles argues that she is entitled to a new trial because the government, through use of a recording, "attributed another person's conduct to [her]."  (Def. Gloria Quiles Mot. for New Trial ¶ 7.)  Specially, she asserts that a woman's voice on the January 11, 2007 recording is not her voice, and suggests that it is that of another Aruba employee named Jessica.  (Def. Gloria Quiles Mot. for New Trial ¶4.)  The only basis for this argument is that the woman in the January 11, 2007 recording, whom the government asserts is Gloria Quiles, refers to Maria Quiles as "the lady" and not "my mother."  This argument is rejected.

Contrary to Gloria Quiles's argument, the January 11, 2007 recording is not the "sole evidence that she personally engaged on a transaction on that date."  (Def. Gloria Quiles Mot. For New Trial 1-2.)  Hector Ayala testified that the woman in the January 11, 2007 recording –  that is, the person assisting him in his transaction – was Gloria Quiles.  (Jan. 11, 2008 Trial Tr. 82.) Accordingly, the Court rejects Gloria Quiles's argument that a new trial is required in the interest of justice because the government has attributed another person's misconduct to her through use of an audio recording, and Gloria Quiles's Motion for New Trial in the Interest of Justice is denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that neither a new trial nor judgment of acquittal is warranted on any of the grounds raised by defendants.  Accordingly, defendants motions for new trial and judgment of acquittal are denied.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **GERMAN QUILES** | : | **07-391-01** |
| **MARIA QUILES** | : | **-02** |
| **GLORIA QUILES** | : | **-03** |

<u>**ORDER**</u>

_____**AND NOW**, this 13th day of August, 2008, upon consideration of defendant German Quiles's Motion for Judgment of Acquittal/Motion for a New Trial (Document No. 109, filed January 24, 2008); defendant Maria Quiles's Motion for Judgment of Aquittal [sic] and New Trial (Document No. 110, filed January 24, 2008)[1] and Motion for Judgment of Aquittal [sic] and New Trial (Document No. 124, filed April 29, 2008); and defendant Gloria Quiles's Motion for Judgment of Acquittal (Document No. 120, filed April 18, 2008) and Motion for a New Trial in the Interest of Justice (Document No. 121, filed April 18, 2008), and the Government's Response to Defendants' Motions for Judgment of Acquittal and New Trial (Document No. 127, filed May 23, 2008), and all accompanying memoranda, for the reasons set forth in attached Memorandum,

**IT IS ORDERED** that defendant German Quiles's Motion for Judgment of Acquittal/Motion for a New Trial (Document No. 109); defendant Maria Quiles's Motion for Judgment of Aquittal [sic] and New Trial (Document No. 110) and Motion for Judgment of Aquittal [sic] and New Trial (Document No. 124); and defendant Gloria Quiles's Motion for Judgment of Acquittal

---

[1]  Maria Quiles filed a Motion for Judgment of Aquittal [sic] and New Trial and Leave to Supplement (Document No. 110) on January 24, 2008.  The Court granted leave to supplement by Order dated January 25, 2008.  On April 29, 2008, Maria Quiles filed a second Motion for Judgment of Aquittal [sic] and New Trial, which covered the arguments made in the first motion.

(Document No. 120) and Motion for a New Trial in the Interest of Justice (Document No. 121) are **DENIED.**

**BY THE COURT:**


**/s/ Honorable Jan E. DuBois**
**JAN E. DUBOIS, J.**

2